FILED

2019 SEP 10  P 1:50

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
#### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | GRAND JURY 19-3 |
| | ) | |
| JOHN DOE 2010R03793 | ) | ~~UNDER SEAL~~   REDACTED |

---

### MOTION AND MEMORANDUM OF LAW IN SUPPORT OF AN ORDER TO SHOW CAUSE AS TO WHY THE GOVERNMENT'S WRIT SUMMONING TESTIMONY AND THIS COURT'S IMMUNITY COMPULSION ORDER SHOULD NOT BE QUASHED, STAYED, OR VACATED

### STATEMENT OF MOTION

Jeremy Hammond, by and through counsel, and pursuant to the First and Fifth Amendments to the United States Constitution, and the statutes of the United States, hereby moves this Court for an order directing the government to show cause as to why its writ summoning his testimony and the immunity compulsion order should not be quashed, stayed or vacated and why the government should not be required to provide Mr. Hammond with: (1) a copy of the government's writ, (2) any affirmations or other documents made by the government in support of the writ and immunity compulsion order, and (3) further detail regarding the scope of the government's intended questioning. Additionally, counsel respectfully requests that this Court set a briefing schedule that will afford Mr. Hammond adequate due process, including time to meet with counsel so that he can be advised of his rights and prepare such other and further submissions as may be necessary to preserve those rights.

Page 1 of 26

## STATEMENT OF FACTS[1]

Jeremy Hammond is a well-known computer hacker and political activist. He is currently serving a ten-year federal prison sentence after pleading guilty, in 2013, to one count of conspiracy to engage in computer hacking—namely, a hack of the computer systems used by the private intelligence firm Strategic Forecasting, Inc. ("Stratfor")—and public dissemination of information obtained through the hack. Mr. Hammond, who was near the end of his 10-year sentence at FCI Memphis, was brought to the Eastern District of Virginia on September 3, 2019, in an effort to compel his testimony before a grand jury this week.

### I.   Procedural Posture

On August 16, 2019, the government informed undersigned counsel, by telephone, that (1) it intended to bring Mr. Hammond to the Eastern District of Virginia to testify before a grand jury; (2) it had already submitted a compulsion order to the clerk's office; and (3) it was in the process of having the U.S. Marshals execute a "writ" to accomplish Mr. Hammond's transfer. The government further represented to counsel that the questions it intended to ask Mr. Hammond pertain

Counsel immediately contacted FCI Memphis in an attempt to schedule a legal call but was not afforded one until August 21, 2019.

On August 20, 2019, United States District Judge Anthony J. Trenga signed an immunity compulsion order[2] compelling Mr. Hammond's testimony pursuant to 18 U.S.C. §§ 6002-03, in

---

[1] For the sake of expediency, counsel has not attached as exhibits the filings from the dockets of the cases in the District Court of the Southern District of New York cited herein. Counsel can certainly provide courtesy copies to this Court should the Court require these documents.
[2] Order (Under Seal), *United States v. John Doe 20T0R03793*, Grand Jury 19-3 (E.D.V.A. Aug. 20, 2019).

connection with the above-captioned grand jury proceeding.  (Undersigned counsel was not made aware of the order at that time and did not receive a copy of the signed order until September 3, 2019.)  On August 21, 2019, immediately after speaking with Mr. Hammond, and again, unaware that the order had already been signed, counsel submitted a letter to the Honorable Anthony Trenga, United States District Judge for the Eastern District of New York, requesting that the Court wait to sign the immunity compulsion order until January 2020, to allow Mr. Hammond to complete his participation in the Bureau of Prisons' "RDAP" drug treatment program, explaining that a transfer from FCI Memphis would effectively end his participation in the program. The government was copied on that communication.  As of August 21, 2019, Mr. Hammond had completed more than five months of the intensive and rigorous nine-month program.  His successful completion of the program would have hastened his release from prison to a halfway house upon completion of the program to December 2019.

After receiving this letter, Judge Trenga's clerk contacted the government to ascertain whether something could be done to preserve Mr. Hammond's place in the program. Counsel communicated with the government about the possibility of ascertaining whether Mr. Hammond would be willing to meet informally with the government to answer questions in FCI Memphis, potentially obviating any need for a transfer to the Eastern District of Virginia. Counsel also tried to gain a greater understanding of the scope of the questions that would be asked, and asked the government to provide written questions, which the government declined to do. In any case, counsel attempted to arrange a second telephone call with Mr. Hammond prior to his move to explore this possibility. Counsel's attempts by telephone and email addressed to Mr. Hammond's counselor failed and Mr. Hammond was moved before a call could be successfully scheduled.

Counsel soon learned that on August 31, 2019, Mr. Hammond was removed from the Federal Correctional Institution in Memphis, Tennessee, where he had been serving the last leg of his 10-year sentence, and taken to the Bureau of Prison's Federal Transfer Center in Oklahoma.  Prior to his move, Mr. Hammond was provided with a notice, pursuant to 18 U.S.C. § 3621(e), that he would receive an incomplete for the three-month RDAP semester that he was days from completing, and had been removed from the program.[3]

On September 3, 2019, Mr. Hammond arrived in the Eastern District of Virginia, and is being held at the William G. Truesdale Adult Detention Center in Alexandria, Virginia.

The government has thus far refused to provide counsel with a copy of the "writ" used to move Mr. Hammond from the FCI Memphis to the Eastern District of Virginia.  After some back and forth on the matter, the government represented in an email, on September 5, 2019, that the "writ" Mr. Hammond had been moved under is an "internal DOJ document" titled "Request of United States Attorney for Production of Federal Prisoner in the Custody of the United States." This is a document that, to undersigned counsel's understanding, is produced pursuant to the BOP's administrative statute, 18 U.S.C. § 3621(d).

The government has also refused our repeated requests for more information on the scope of the questions Mr. Hammond will be asked so that we can consult with our client in advance of any grand jury appearance to preserve any rights that might be at stake. And notwithstanding counsel's prior commitments, the government had refused our request to put off Mr. Hammond's grand jury appearance until the October sitting.

---

[3] If Mr. Hammond were back in Memphis in time to start the next 3-month term - which he will not be, as it begins this week — he would be three months behind, as he would be required to repeat the last term over again. Given the timing, the earliest he can resume the program would be at the beginning of the following term, which begins in December — which, had he not been removed from the program would have coincided with his release date to a halfway house.

Counsel's first opportunity to meet with Mr. Hammond after being made aware that the immunity compulsion order had been signed—and after Mr. Hammond was removed from FCI Memphis—was on Monday, September 9, 2019, at the William G. Truesdale Adult Detention Center in Alexandria, Virginia. We prepared this motion after having an opportunity to consult with Mr. Hammond.

**Background**

In December of 2006, when he was 21 years old, Mr. Hammond was sentenced to two years in federal prison for breaking into the computer system of Protest Warrior, a Texas-based pro-war organization that aggressively targeted anti-war activists. He surrendered on January 3, 2007, and served his term of incarceration at the Federal Correctional Institution in Greenville, Illinois. He was released in the summer of 2008. While in prison, Mr. Hammond learned about the protest group Anonymous, a loosely-associated group of activists and hacktivists around the world.

By December 2010, Anonymous had spawned a burgeoning internet-based activist movement, and was credited with launching, in the words of Dr. Gabriella Coleman, the Wolfe Chair in Scientific and Technological Literacy at McGill University, "one of the first large-scale demonstrations conducted on the Internet . . . providing a paradigm for online protest."[4] Mr. Hammond, a talented computer programmer, and a committed activist since his days organizing walkouts from his high school in protest of the Iraq War, observed the actions of Anonymous with increasing interest.

---

[4] Janet Reitman, *The Rise and Fall of Jeremy Hammond: Enemy of the State*, Rolling Stone, Dec. 7, 2012, *available at* http://www.rollingstone.com/culture/news/the-rise-and-fall-of-jeremy-hammond-enemy-of-the-state-20121207.

Also in 2010, Mr. Hammond, like countless others around the world, viewed with horror a leaked military video that exposed the killing of unarmed civilians and two Reuters journalists by a United States Apache helicopter crew in Iraq. The "Collateral Murder" video shook the world, and the young army private behind its leak was soon revealed upon her very public arrest, imprisonment and prosecution. A former prisoner himself by then, Mr. Hammond followed Chelsea Manning's plight with great sympathy, and saw her as a selfless hero, an individual whose actions had effectively changed the world.

These events of 2010 caused Mr. Hammond to wonder whether he had a greater responsibility to use his technological skills in service of a growing movement aimed at opening the cloistered world of cyberspace to the people.[5]

## II.     The Government Informant and the Stratfor Hack

On June 7, 2011, federal agents arrested a man by the name of Hector Monsegur in Manhattan, New York.[6] Mr. Monsegur, known by the online pseudonym "Sabu," was widely recognized and respected as an Anonymous leader. Immediately after his arrest, Mr. Monsegur began cooperating with the government. In his capacity as a government cooperator, he continued to operate online as Sabu, and on June 19, 2011, twelve days after his arrest, he announced to his large Twitter following the formation of a new hacking group called Antisec.[7]

---

[5] As Mr. Hammond explained at his guilty plea in 2013, "I thought long and hard about choosing this path again, and I had to ask myself if Chelsea Manning fell into the abysmal nightmare of prison fighting for truth, could I in good conscience do any less if I was able? I thought the best way to demonstrate solidarity was to continue the work of exposing and confronting corruption." Transcript of Mr. Hammond's Plea Hearing, at 34, *United States v. Hammond*, 12 Cr. 185 (LAP) (S.D.N.Y. May 28, 2013) (Doc. No. 50). (hereinafter "Hammond Plea Transcript").

[6] *See* Government's Memorandum in Support of Its Motion Pursuant to U.S.S.G. § 5K1.1, at 7 *United States v. Hector Monsegur*, 11 Cr. 666 (LAP) (S.D.N.Y. May 23, 2014), (Doc. No. 30) (hereinafter "Government's 5K Memorandum").

[7] Mr. Monsegur's full Twitter message was: "Operation Anti Security:http://pastebin.com/9KyA0E5v – The biggest, unified operation amongst hackers in

Mr. Monsegur encouraged his followers to join the group and the online chat rooms he had created.[8]

One of the individuals inspired by Mr. Monsegur to join the new hacking group was Mr. Hammond.  Mr. Hammond and Mr. Monsegur were soon engaging in regular communication in online chat rooms.  At the direction of his FBI handlers, Mr. Monsegur wasted no time in encouraging Mr. Hammond to hack various government and corporate websites, even providing Mr. Hammond lists and names of specific companies and entities to hack.  One of these was Stratfor, a private intelligence firm with powerful governmental clients ranging from the Departments of Homeland Security and Defense to former Secretary of State Henry Kissinger.  Mr. Monsegur fed Mr. Hammond these targets to hack as part of his cooperation with the federal government.[9]

The extent of Mr. Monsegur's cooperation with the government is a matter of public record.  From the moment of his arrest, he worked "literally around the clock with federal agents."[10]  The government installed software on his computer that tracked his online activity, and video surveillance in his residence, all of which was closely monitored by the government.[11]  Mr. Monsegur's immediate cooperation with the agents who came to his home enabled the government to confirm Mr. Hammond's identity and the identities of others, and to conduct real-

---

history. All factions welcome. We are one." Mr. Monsegur's tweets are no longer available online.  However, an archive of these tweets is available at http://sabufiles.com/tweetarchive/.  The same day, "Operation Antisec" was announced via Pastebin: https://pastebin.com/9KyA0E5v.

[8] *Id.*

[9] Sentencing Addendum (Exhibit H Additional Relevant Conduct - Redacted), *United States v. Hammond*, 12 Cr. 185 (LAP) (S.D.N.Y. Apr. 16, 2014) (Doc. 69-1).

[10] *See* Transcript of Arraignment (Exhibit E to Sentencing Submission), at 8-9, *United States v. Monsegur*, 11 Cr. 666 (LAP) (S.D.N.Y. Aug. 5, 2011) (Doc. 32-5) (hereinafter "August 5, 2011 Monsegur Transcript)

[11] *Id.*, at 9.

time physical and electronic surveillance, during which they were able to capture all of Mr.

Hammond's communications with Mr. Monsegur.[12]

As the government further explained in its motion under U.S.S.G. § 5K1 in support of a

reduced sentence for Mr. Monsegur:

> Working sometimes literally around the clock, at the direction of
> law enforcement, Monsegur engaged his co-conspirators in online
> chats that were critical to confirming their identities and
> whereabouts.
> . . .
> Monsegur's cooperation was complex and sophisticated, and the
> investigations in which he participated required close and precise
> coordination with law enforcement officers in several locations.
> For instance, during the investigation of Hammond, Monsegur
> (who was then in New York) engaged in online chats with
> Hammond (who was then in Chicago), while coordinating with
> FBI agents in New York, physical surveillance teams deployed in
> Chicago, and an electronic surveillance unit in Washington, D.C.[13]

Similarly, Mr. Monsegur's defense counsel noted:

> As the government explains in its motion, Mr. Monsegur's timely
> decision to cooperate prevented the destruction of evidence,
> allowed the government to develop the evidence necessary for
> several successful prosecutions, helped prevent and mitigate
> hundreds of hacks, and established proof that a significant subject
> of global law enforcement efforts had been soliciting cyber attacks
> against a foreign government.[14]

---

[12] *See* Government's 5K Memorandum at 8-9.
[13] *Id.*, at 11-12.
[14] Sentencing Submission Letter, *United States v. Monsegur*, 11 Cr. 666 (LAP) (S.D.N.Y. May
23, 2014) (Document No. 32).

### III.    The Arrest, Prosecution, and Sentencing of Mr. Hammond

On March 5, 2012, Mr. Hammond was arrested by FBI agents at his Chicago home for actions related to the Stratfor hack.[15] At the time of his arrest, agents seized his laptop, the contents of which were subsequently made available to defense counsel as part of discovery.

On May 28, 2013, in the United States District Court for the Southern District of New York, pursuant to a plea agreement, Mr. Hammond pled guilty to one count of conspiracy to engage in computer hacking, from in or about June 2011 to in or about March 2012—namely, a hack of the computer systems used by Strategic Forecasting, Inc. ("Stratfor"), and public dissemination of information obtained through this hack, in violation of 18 U.S.C. § 1030(b).[16] The offense carried a 10-year maximum term of imprisonment.

Pursuant to his plea agreement, the government agreed to grant Mr. Hammond immunity from further prosecution in all 94 federal judicial districts of the United States.[17]

On the day of his guilty plea, Mr. Hammond made the following public statement:

> Today I pleaded guilty to one count of violating the Computer
> Fraud and Abuse Act. This was a very difficult decision. I hope
> this statement will explain my reasoning. I believe in the power of
> the truth. In keeping with that, I do not want to hide what I did or
> to shy away from my actions. This non-cooperating plea agreement
> frees me to tell the world what I did and why, without exposing
> any tactics or information to the government and without

---

[15] *See* Press Release, United States Attorney's Office for the Southern District of New York, Mar. 6, 2012, *available at*
https://www.justice.gov/archive/usao/nys/pressreleases/March12/ackroyd.html.

[16] *See* Hammond Plea Transcript.

[17] In addition, pursuant to the plea agreement, Mr. Hammond admitted, as relevant conduct to be considered at the time of sentencing, his involvement in the hacks, and dissemination of confidential information obtained through the hacks, of computer systems used or owned by (1) the Arizona Department of Public Safety, in June 2011, (2) the Federal Bureau of Investigation's Virtual Academy, in June 2011 (3) Brooks-Jeffrey Marketing, Inc., in July 2011, (4) Special Forces Gear, in August 2011, (5) Vanguard Defense Industries, in August 2011, (6) the Jefferson County, Alabama Sheriff's Office, in October 2011, (7) the Boston Police Patrolmen's Association, in October 2011, and (8) Combined Systems, Inc., in February 2012.

jeopardizing the lives and well-being of other activists on and offline.[18]

On November 15, 2013, Mr. Hammond was sentenced to 10 years' imprisonment.[19]  At his sentencing, he made a lengthy statement about his beliefs and motivations, which included the following:

> The acts of civil disobedience and direct action that I am being sentenced for today are in line with the principles of community and equality that have guided my life. Yes, I hacked into dozens of high-profile corporations and government institutions, understanding very clearly that what I was doing was against the law and that my actions could land me back in federal prison, but I felt I had an obligation to use my skills to expose and confront injustice and to bring the truth to light.[20]

Immediately after Mr. Hammond's sentencing, agents from the Federal Bureau of Investigation accompanied Mr. Hammond's defense counsel to counsel's office and removed all copies of every piece of discovery, pursuant to the protective order in the case.

## IV.    Mr. Hammond's Imprisonment

Mr. Hammond has spent the past seven-and-a-half years in prison as a result of his conviction for the Stratfor hack.  He has served this sentence with the knowledge that the hacks he has been held accountable for, he engaged in not for personal profit, but in the spirit of his opposition to the abuses of powerful government entities and their corporate accomplices. While imprisoned, Mr. Hammond has maintained his deeply-held political convictions, and has continued to speak out in support of other activists, and in opposition to various governmental policies, actions, and figures. His support for goals such as prison abolition and the elimination

---

[18] The full statement is available at https://www.sparrowmedia.net/2013/05/jeremy-hammond-plea-deal/.
[19] Transcript of Mr. Hammond's Sentencing, at 31, *United States v. Hammond*, 12 Cr. 185 (LAP) (S.D.N.Y. Nov. 13, 2015) (Doc. No. 65). (hereinafter "Hammond Sentencing Transcript")
[20] *Id.*

of police forces, because of the inherent abuses such institutions bring, comes from his strongly-held anarchist and antifascist worldview and ideals—a worldview that seeks a more egalitarian society where every human being is afforded dignity and fair treatment.  His years-long imprisonment, and the vulnerability to retaliation it brings, have not deterred him from publicly expressing views and opinions that are increasingly being treated as criminal.

The threat of retaliation is very real.  It has been a very long seven-and-a-half years for Mr. Hammond, who has been subjected to serious ongoing psychological trauma and abuse, including months in "segregated housing" (the Bureau of Prisons' term for what is essentially solitary confinement[21]), as part and parcel of his prison sentence.  Further, the current administration has made crystal clear its estimation of individuals who, like Mr. Hammond, identify as anarchist and antifascist (often referred to by the shortened "antifa").  Indeed, as recently as August 17, 2019, the President of the United States himself tweeted that "[m]ajor consideration is being given to naming ANTIFA an 'ORGANIZATION OF TERROR.'"[22]

## ARGUMENT

I.   **THE GOVERNMENT'S WRIT IS INVALID BECAUSE HIS APPEARANCE BEFORE THE GRAND JURY IS NOT "NECESSARY"**

A.   **A writ seeking to compel a prisoner's testimony in court is governed by the same rules that govern subpoenas.**

The government purportedly secured a writ that empowered it to snatch Mr. Hammond from FCI Memphis and drag him almost two thousand miles around the country, first, 467 miles

---

[21] Citing scientific studies that establish lasting mental damage caused after only a few days of social isolation, the United Nations Special Rapporteur on torture found that solitary confinement can amount to torture, and called for an "absolute prohibition" on terms in excess of 15 days. *Solitary confinement should be banned in most cases, UN expert says*, UN News, Oct. 18, 2011, *available at* https://news.un.org/en/story/2011/10/392012-solitary-confinement-should-be-banned-most-cases-un-expert-says.
[22] https://twitter.com/realDonaldTrump/status/1162726857231544320.

to Oklahoma City, Oklahoma; then, an additional 1378 miles to the Eastern District of Virginia, by way of Pennsylvania.  What the government refers to as its "writ" is a "Request of United States Attorney for Production of Federal Prisoner in the Custody of the United States," pursuant to 18 U.S.C. § 3621(d),[23] and not the traditional writ of habeas corpus ad testificandum traditionally used by federal prosecutors to secure a prisoner's appearance before a grand jury for testimony, pursuant to 28 U.S.C. § 2241(c)(5).[24]  However, when 18 U.S.C. § 3621(d) was enacted in 1984 (and largely replaced the use of the traditional writ in the case of federal prisoners), there is no indication that it dispensed with the rules governing the power of prosecutors to compel a prisoner's appearance for testimony before a grand jury.[25]  Nor does it dispense with the Court's supervisory powers over the grand jury process, or curtail the rights of prisoners who are compelled using this abbreviated procedural mechanism.

Circuit courts continue to recognize, long after the enactment of 18 U.S.C. § 3621(d), that "[w]rits of habeas corpus ad testificandum, when submitted by federal prosecutors to secure the presence of prisoners before the grand jury, are *governed by the same rules that govern the issuance of subpoenas*: Rule 17 of the Federal Rules of Criminal Procedure.  *United States v. Garrard*, 83 F.3d 889, 893 (7th Cir. 1996); *United States v. Rinchack*, 820 F.2d 1557, 1567 n. 13 (11th Cir. 1987).  When these writs are submitted by prosecutors, they are meant to serve the

---

[23] 18 U.S.C. § 3621(d) provides that "[t]he United States marshal shall, without charge, bring a prisoner into court or return him to a prison facility on order of a court of the United States or on written request of an attorney for the Government."

[24] 28 U.S.C. § 2241(c)(5) provides that "[t]he writ of habeas corpus shall not extend to a prisoner unless . . . [i]t is necessary to bring him into court to testify or for trial."

[25] The legislative history to 18 U.S.C. § 3621 makes clear that the purpose of the statute was "to simplify the administration of the prison system," not to alter authority.  S. Rep. No. 98-225, 98th Cong., 2nd Sess. 141, reprinted in 1984 U.S.C.C.A.N. 3182, 3324 ("[18 U.S.C. § 3621] is not intended to affect the authority of the Bureau of Prisons with regard to such matters as place of confinement of prisoners, transfers of prisoners, and correctional programs, but is designed only to simplify the administration of the prison system.").

same purposes as subpoenas; they simply obligate a different party (i.e., the custodian of the would-be witness rather than the would-be witness himself). *Garrard*, 83 F.3d at 893." *Lopez v. Dep't of Justice*, 393 F.3d 1345, 1350 (D.C. Cir. 2005) (emphasis added); *see also, e.g., United States v. Lach*, 874 F.2d 1543 (11th Cir. 1989) ("Although typically an individual's presence before a grand jury is secured by the issuance of a grand jury subpoena, when a prisoner's appearance before a grand jury is sought, issuance of a writ of habeas corpus ad testificandum is an appropriate means by which his appearance may be secured.").

Thus, the government's writ compelling Mr. Hammond's appearance before the grand jury is, like a subpoena, subject to the supervision and review of the district court, and may be quashed. *United States v. Dionisio*, 410 U.S. 1, 12 (1973) ("Grand juries are subject to judicial control and subpoenas to motions to quash.").

As set forth above, writs seeking to compel a prisoner's testimony are governed by the same rules governing subpoenas. Just like non-prisoner witnesses whose testimony is compelled via subpoena, Mr. Hammond is entitled to a modicum of due process, which includes service with the document compelling his testimony, adequate time to consult with counsel, and the opportunity to challenge the lawfulness of his compulsion or otherwise argue that his testimony is being sought for an improper purpose.

Here, the Court must quash the government's writ because the government failed to provide Mr. Hammond with a copy of the writ and therefore did not provide the required notice. For a subpoena, oral notice does not suffice. *See* Fed. R. Crim. Pr. 17. The witness, whether a prisoner or not, must be served with a copy of the document compelling his testimony. The immunity compulsion order (a signed copy of which undersigned counsel did

not receive until September 3, 2009, two weeks after the Court approved it) does not suffice because it is not the writ itself.

Further, and as outlined in our Statement of Facts, *supra*, the government, at every turn, has denied our requests to be afforded the same process it affords to the witnesses it compels through subpoena. The government's dogged efforts to deny Mr. Hammond any of the protections afforded to subpoenaed non-prisoner witnesses effectively usurps the Court's independent duty to safeguard the integrity of grand jury proceedings in exercise of its supervisory powers.

**B. A writ seeking to compel a prisoner's testimony in court may only be issued if the prisoner's testimony is "necessary."**

Further, a writ seeking to compel a prisoner's appearance in court to testify may only be issued if the prisoner's testimony is "necessary."[26] 28 U.S.C. § 2241(c)(5).  In the context of a criminal trial, courts recognize that a criminal defendant seeking issuance of a writ of habeas corpus ad testificandum bears "the burden of proving the necessity of [that] witness's testimony." *United States v. Cruz-Jiminez*, 977 F.2d 95 (3d Cir. 1992); *see also, e.g., United States v. Thomas*, No. CR 2015-0039, 2019 WL 2906306, at *1 (D.V.I. July 5, 2019). The defendant bears the burden even though, in the context of a criminal trial, courts give particular care to the defendant's request for the writ to assure the defendant's rights under the due process clause of the Fifth Amendment and the right to confront witnesses under the Sixth Amendment.

---

[26] *See Jones v. Lilly*, 37 F.3d 964, 967 (3d Cir. 1994) ("District courts are authorized to issue writs only in a number of limited circumstances. . . . Under this statute, a writ may extend to a prisoner when '[i]t is necessary to bring him into court to testify or for trial.' . . . [T]he statute represents the codification of the common law writs of habeas corpus ad testificandum and ad prosequendum issued when necessary to produce a prisoner to prosecute him or obtain his appearance as a witness.") (citations omitted).

In the grand jury context, the same statute, and therefore the same plain language requiring necessity, applies to the writ when requested by a prosecutor to compel a prisoner's appearance before a grand jury.  Indeed, federal prosecutors have long recognized the requirements of necessity and materiality in their applications for the writ.  *See, e.g., United States v. Santiago*, 3 F. Supp. 2d 392, 394 (S.D.N.Y. 1998) (noting that, "[i]n order to obtain the writ of habeas corpus ad testificandum, a supporting Affirmation was submitted by an Assistant United States Attorney ('AUSA'). . . . In her affirmation, the AUSA . . . states that [the proposed prisoner-witness] 'is believed by the Drug Enforcement Administration and the New York City Police Department to have certain information which will be *material and necessary* to present to the Grand Jury.'") (emphasis added).

C.     **The government cannot make any showing that Mr. Hammond's testimony is "necessary" given the extraordinary facts of Mr. Hammond's case.[27]**

As set forth above, for the government's writ to be valid, the government must be able to make some showing that Mr. Hammond's testimony is "necessary".  The government here

---

[27] Although the Court has issued Mr. Hammond an immunity compulsion order pursuant to 18 U.S.C. §§ 6002-03, it is important to recognize that, even if the Court has found that the government satisfied the "necessary to the public interest" requirement for such an order, that requirement is distinct from, and insufficient to satisfy, the writ requirement that a prisoner's testimony be "necessary."  This is because of the special considerations immunity orders present: 18 U.S.C. §§ 6002-03 "limited grants of immunity to witnesses whose testimony, in the judgment of the United States attorney, was necessary to the public interest.  The [Supreme] Court, *recognizing the potential constitutional question that would arise if the judiciary reviewed the merits of immunity*, construed the statute to withhold from the district court '*any* discretion to deny the order on the ground that the public interest does not warrant it.'  It held that the function of the district court was limited to ascertaining whether the application complied with the statutory requirement—that is, had the United States attorney certified that in his judgment the testimony of the witness was in the public interest." *In re Kilgo*, 484 F.2d 1215, 1219 (4th Cir. 1973) (quoting *Ullmann v. United States*, 350 U.S. 422, 432-34 (1956)).  In contrast, courts have discretion to deny or approve a writ seeking a prisoner's testimony. *See* United States v. Wright, 63 F.3d 1067, 1070 (11th Cir. 1995).

simply cannot do so with respect to any testimony Mr. Hammond could possibly provide. What

consequence, all of the evidence the government could possibly need in its grand jury

investigation is already in its possession.

Moreover, the government has indicated, in clear terms, to undersigned counsel that the

questions it intends to ask Mr. Hammond pertain

---

28

[29] As mentioned above, immediately after Mr. Hammond's sentencing in November 2013, FBI
agents accompanied Mr. Hammond's defense counsel to counsel's offices, where counsel
relinquished to the FBI any and all discovery in the case in counsel's possession, pursuant to the
governing protective order.

Page 16 of 26

Given this reality, the government's only plausible purpose in summoning Mr.

Hammond[30] is to question him regarding                                        which is

improper.  A grand jury witness is justified in refusing to answer a question that seeks only his or

her opinion about some aspect of the matter under investigation.  *See United States v. Doe*

*(Popkin)*, 460 F.2d 328 (1st Cir. 1972) (ruling that question was improper where political

scientist was asked his opinion about who might have possessed a classified Defense Department

study concerning American involvement in Vietnam, and asked to reveal who had supplied him

with the basis for his opinion).  Here, the best evidence

                                                                The only

questions that could be asked of Mr. Hammond that are not cumulative would be questions that

solicit his opinion which is not only improper but also extraneous


For the reasons stated above, it is clear that Mr. Hammond's testimony is not

"necessary." Accordingly, this Court should grant Mr. Hammond's motion to stay or quash the

government's writ and vacate the accompanying immunity compulsion order.[31]

---

[30] Aside from the abuses of the grand jury process described in Section II, *infra*.
[31] Mr. Hammond also moves for an order compelling the government to provide him (1) a copy of the government's writ, (2) any affirmations or other documents supporting the writ and immunity compulsion order, and (3) further detail regarding the scope of its intended questioning; and reserves further argument until such documents and information are made available.

**II.   THE GOVERNMENT'S WRIT AND IMMUNITY COMPULSION ORDER SEEK TO COMPEL TESTIMONY FOR AN IMPROPER PURPOSE IN ABUSE OF THE GRAND JURY PROCESS**

As established above, there is no testimony Mr. Hammond could provide that would be necessary or material to any subject that could be properly investigated by this grand jury. The government knows this (for the reasons stated in Section I, *supra*), which suggests that Mr. Hammond was compelled to this grand jury for an improper purpose, in abuse of the grand jury process.

District courts are charged with the supervisory duty to ensure that the grand jury "process is not abused or used for purposes of oppression or injustice." *United States v. U.S. Dist. Court for S. Dist. of W. Va.*, 238 F.2d 713, 722 (4th Cir. 1956); *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016); *Hale v. Henkel*, 201 U.S. 43, 65 (1906) (district courts must be "alert to repress abuses of [the grand jury's] investigatory power") (overruled in part on other grounds). "The principles that the powers of the grand jury may be used only to further its investigation, and that a court may quash a subpoena used for some other purpose, are both well recognized." *United States v. (Under Seal)*, 714 F.2d 347, 349-50 (4th Cir. 1983); *United States v. Dionisio*, 410 U.S. 1, 12 (1973) ("Grand juries are subject to judicial control and subpoenas to motions to quash.").

Accordingly, this Court has the duty to explore the premise and validity of the government's writ compelling Mr. Hammond's appearance before the grand jury, and to prevent its use for improper purposes.

**A.** **The government has compelled Mr. Hammond's testimony in order to harass and intimidate him, and to coerce his contempt, as well as to chill First Amendment-protected activity.**

Because the government has nothing to gain substantively from Mr. Hammond's testimony, its efforts to compel him to testify – and threats of additional jail time if he does not comply – comport more credibly with an effort to harass and intimidate him, retaliate against him because of the content of his speech, in violation of his First Amendment rights,[32] and coerce his contempt, a clear abuse of the grand jury process. In this case, the government's actions are particularly suspect, in that the government prepared the immunity compulsion order before Mr. Hammond was even notified that the government would be seeking his testimony, days before he was moved from his prison at FCI Memphis, and before he had any chance to appear before the grand jury and make any assertions of Fifth Amendment privilege.

The Fourth Circuit has recognized the potential dangers to freedom of expression that are implicated by prosecutorial abuse of grand jury proceedings: "To prevent the chilling effect such prosecutorial abuse would cause, we caution district courts to apply with special sensitivity, where values of expression are potentially implicated, the traditional rule that '[g]rand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass.'" *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 234 (4th Cir. 1992) (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)).

---

[32] Mr. Hammond's status as a prisoner does not diminish his First Amendment rights in this context. Prisoners "clearly retain protections afforded by the First Amendment," *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), such as the right to be free from interference that "is based on the content of [his] speech." *Kimberlin v. Quinklan*, 199 F.3d 496, 502 (D.C. Cir. 1999). Accordingly, courts have held for decades that a prisoner's "[F]irst [A]mendment right to freedom of expression encompasses the right to express himself without punitive retaliation." *Simmat v. Manson*, 535 F. Supp. 1115, 1117-18 (D. Conn. 1982).

Here, there are abundant reasons to suggest that Mr. Hammond's testimony is being compelled for an improper purpose. First, Mr. Hammond is an outspoken political activist who has never shied away from expressing his political beliefs. Prison has only reinforced his commitment to that expression, particularly with respect to expressions of opposition to the abuses of law enforcement and injustices committed by the United States government. At the same time, the current administration has increasingly made clear its antagonism toward individuals who, like Mr. Hammond, publicly identify as anarchist and antifa, and engage in robust expression of their political views—views particularly disfavored by the current administration.

Further, Mr. Hammond received the maximum sentence available by law under the statute to which he pled guilty, (and as discussed in Section II.B, *infra*) this process is coming at the end of that sentence, as he is preparing to rejoin society. Based on the explicit statements of this administration, and given the timing of the government's decision to compel him (*see* Section II.B, *infra*), counsel submits that the grand jury process is being abused in an effort to extend Mr. Hammond's term of incarceration to punish him for his anti-government beliefs and statements.

**B.      The timing of the government's writ supports a finding of impermissible purpose.**

Last-minute issuance of a grand jury subpoena can suggest a bad faith attempt to improperly use the power of the grand jury. *See United States v. Jeter*, No. CRIM. CCB-14-0121, 2015 WL 114118, at *3 (D. Md. Jan. 7, 2015). Here, the timing of the government's decision to compel Mr. Hammond's testimony further supports a finding that the government is motivated by the improper purposes set forth above.

Mr. Hammond has been incarcerated since March 5, 2012, when he was arrested on the

Southern District of New York case for which he is currently serving a prison sentence.   That

case concerns a time period spanning June 2011 to March 2012

And, as

stated earlier, the government has represented to counsel that it intends to question Mr.

Hammond

The government has provided no explanation

for why                                                  seeking Mr. Hammond's testimony.

It is counsel's understanding that this grand jury investigation has been ongoing for a

considerable time. Instead of proceeding diligently and in good faith, however, the government

waited to compel Mr. Hammond at a time when it would be particularly cruel—when he was less

than four months away from his projected release to a halfway house, after seven-and-a-half

years in prison.   The timing of the government's request is highly suspect, especially in light of

the fact that the government

Further, after learning of the government's intentions on August 16, 2019, and speaking

to Mr. Hammond, at our first opportunity, by telephone, on August 21, 2019, counsel informed

the Court and the government that Mr. Hammond was then-enrolled in an intensive, rigorous

drug treatment program (RDAP) at FCI Memphis, and requested that Mr. Hammond be allowed

to complete the program. At the time, Mr. Hammond had less than four months remaining of the

nine-month program – a program that serves not only Mr. Hammond's interest, and the interests

of his family and community upon his release, but also the interests of the broader public and the

Bureau of Prisons itself.[33] The government gave little consideration to counsel's request, instead presenting an artificially created urgency to its sudden need, after eight long years, for Mr. Hammond's testimony. Mr. Hammond's subsequent transfer would effectively end his participation in the program.[34]

District courts, in the exercise of their supervisory powers, have discretion to deny or quash a writ that seeks to compel a prisoner to testify, and, if the writ would result in the disruptive removal of the prisoner from his current prison, an important consideration district judges consider when exercising that discretion is whether the testimony can wait "until the prisoner is released without prejudice to the cause asserted." *United States v. Wright*, 63 F.3d 1067, 1070 (11th Cir. 1995) (quoting *Ballard v. Spradley*, 557 F.2d 476, 480 (5th Cir.1977)). The government has provided no explanation for the urgency with which it is now operating in Mr. Hammond's case, to the great detriment of Mr. Hammond and the broader public. For this reason, in addition to all those stated above, this Court should quash the government's writ and vacate the immunity compulsion order.

---

[33] As the Bureau of Prisons reports: "The Bureau and National Institute on Drug Abuse combined funding and expertise to conduct a rigorous analysis of the Bureau's RDAP. Research findings demonstrated that RDAP participants are significantly less likely to recidivate and less likely to relapse to drug use than non-participants. The studies also suggest that the Bureau's RDAPs make a significant difference in the lives of offenders following their release from custody and return to the community." Federal Bureau of Prisons, Substance Abuse Treatment, *available at* https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp (last visited Sept. 7, 2019).

[34] Indeed, immediately prior to his transfer, Mr. Hammond was informed by the Bureau of Prisons that would be receiving an incomplete for the 3-month semester he was days from completing, that he was no longer enrolled in RDAP, and that the time he had earned off of his prison sentence from his RDAP participation had been revoked. Given the time left on Mr. Hammond's sentence, it is now very doubtful that he will be afforded the opportunity to complete the program, negating all of the hard work he has done.

C.    **The government's sudden need for Mr. Hammond's testimony ensures that Mr. Hammond does not receive adequate counsel.**

Finally, because of the artificial urgency with which the government is moving to get Mr. Hammond before the grand jury, counsel was unable to meet with him until Monday, September 9, 2019.  Before that, Mr. Hammond, who has, in just the past two weeks, been shuttled from Tennessee west to Oklahoma, and then east to Pennsylvania and Virginia, has been unable to speak with his counsel.  Counsel, who also served as Mr. Hammond's defense counsel on his Southern District of New York criminal case, is based in New York City and has had no opportunity, until yesterday, to advise him and discuss with him how he wishes to proceed.

The government's haste interferes with the attorney-client relationship and prevents Mr. Hammond from any adequate preparation he may need to protect his rights from grand jury abuses.  This is improper, as the Fourth Circuit has made clear:

> Though an unindicted grand jury witness' sixth amendment right to counsel does not attach at the grand jury stage, the witness nonetheless is 'faced with the prosecutorial forces of organized society and immersed in the intricacies of substantive and procedural criminal law.' . . . Thus, even though the witness does not have the right to have counsel appointed for him, *he has a substantial interest in continuing to receive the assistance of counsel he has already retained for purposes of the grand jury investigation.*  The interests in maintaining a proper attorney-client relationship and protecting the confidences of that relationship are similar to the sixth amendment right to effective assistance of counsel and fundamental to our adversarial system of justice.

*In re Special Grand Jury No. 81-1*, 676 F.2d 1005 (4th Cir. 1982) (emphasis added).

Mr. Hammond has counsel from whom he wishes to seek advice, including with regard to any challenges he may wish to assert prior to appearing before the grand jury.  If, instead of dragging Mr. Hammond hither and yon, the prosecutor had waited a mere four months (which is not much to ask, after the government sat on its hands for eight years) until Mr. Hammond's

projected release from prison, and issued Mr. Hammond a subpoena then, Mr. Hammond would have had a meaningful opportunity to meet with counsel before having to appear before the grand jury.  His status as a prisoner does not – and indeed, should not – allow the government to transform him into a piece of inventory that a prosecutor can order around at will, without regard to his representation by counsel or his due process rights, or even the supervisory powers of the Court.

## CONCLUSION

For the reasons set forth above, this Court should issue an order directing the government to show cause as to why its writ summoning Mr. Hammond's testimony and the immunity compulsion order should not be stayed, vacated, or quashed; the government should not be required to provide Mr. Hammond with (1) a copy of the government's writ, (2) any affirmations or other documents supporting the writ and immunity compulsion order, and (3) further detail regarding the scope of the government's intended questioning. Furthermore, counsel requests that this Court set a briefing schedule that will afford Mr. Hammond adequate due process, including time to meet with counsel so that he can be advised of his rights and prepare such other and further submissions as may be necessary to preserve those rights, and ensure the integrity of the grand jury process.

Respectfully Submitted,
By Counsel

Dated: September 10, 2019

SUSAN G. KELLMAN
Law Offices of Susan G. Kellman
25 Eighth Avenue
Brooklyn, NY 11217
Tel: (718) 783-8200  Fax (718) 783-8226
sgk@kellmanesq.com
*Pro Hac Vice Admission Pending*

SARAH KUNSTLER
Law Office of Sarah Kunstler
315 Flatbush Avenue
Brooklyn, NY 11217
Tel: (718) 783-3682  Fax (347) 402-2014
sarah@kunstlerlaw.com
*Pro Hac Vice Admission Pending*

JEFFREY D. ZIMMERMAN
VA Bar #38858
Jeffrey Zimmerman, PLLC
108 N. Alfred St.
Alexandria, VA 22314
Tel: (703) 548-8911  Fax (703) 548-8935
zimpacer@gmail.com
*Local Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September 2019, a true and accurate copy of the foregoing was served on Gordon Kromberg, Assistant United States Attorney, 2100 Jamieson Ave, Alexandria, Virginia, 22314.

JEFFREY D. ZIMMERMAN

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | **GRAND JURY 19-3** |
| | ) | |
| JOHN DOE 2010R03793 | ) | |
| | | **ORDER** |

Upon the annexed declaration of Susan G. Kellman, Esq, the memorandum of law, and all exhibits filed in support of the moving papers, and upon the copy of the pleadings hereto annexed, it is

ORDERED, that the United States government show cause before a motion term of this Court, at Room _____, United States Court House, Albert V. Bryan U.S. Courthouse, 401 Courthouse Square, Alexandria, VA 22314 on _____, 2019, at _____ o'clock in the _____ noon thereof, or as soon thereafter as counsel may be heard, why its writ summoning Mr. Hammond's testimony and the immunity compulsion order should not be quashed, stayed or vacated and why the government should not be required to provide Mr. Hammond with: (1) a copy of the government's writ, (2) any affirmations or other documents supporting the writ and immunity compulsion order, and (3) further detail regarding the scope of the government's intended questioning; and it is further

ORDERED, that sufficient reason having been shown, therefore, pending a hearing on the Motion for an Order to Show Cause as to Why the Government's Writ Summoning

Testimony and This Court's Immunity Compulsion Order Should Not Be Quashed, Stayed, Or Vacated, the summons and compulsion of the testimony of Mr. Hammond as a witness before the grand jury is stayed, and it is further

ORDERED, that the government shall serve by hand delivery upon counsel for Mr. Hammond any opposition to the above motion no later than _____ o'clock in the _____ noon, _____ _____, 2019; and that counsel for Mr. Hammond shall serve by hand delivery upon the government any reply in support of the above motion no later than _____ o'clock in the _____ noon, _____, 2019.

DATED:      Alexandria, Virginia
            September __, 2019

_____
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | GRAND JURY 19-3 |
| | ) | |
| JOHN DOE 2010R03793 | ) | |

## DECLARATION OF SUSAN G. KELLMAN, ESQ.

I, SUSAN G. KELLMAN, an attorney whose *pro hac vice* admission is currently pending in the Eastern District of Virginia, declare the following under penalties of perjury:

1.  I am one of the attorneys for the witness, Jeremy Hammond, who has been summoned to appear before the above-captioned grand jury. I represented Mr. Hammond in his criminal matter in the Southern District of New York, and as such, I am familiar with the facts and circumstances detailed herein based upon my personal knowledge and my review of the files in this case.

2.  I respectfully submit this declaration in support of an order directing the government to show cause as to why its writ summoning his testimony and the immunity compulsion order should not be quashed, stayed or vacated and why the government should not be required to provide Mr. Hammond with: (1) a copy of the government's writ, (2) any affirmations or other documents supporting the writ and immunity compulsion order, and (3) further detail regarding the scope of the government's intended questioning.

3.  Mr. Hammond proceeds by order to show cause rather than by notice of motion to insure a prompt adjudication of the issues raised in this proceeding.

4.  On September 10, 2019, I informed the government via electronic mail of our intent to proceed in this manner.

5.  Upon the filing of this Order to Show Cause, a copy of this application was hand-delivered to the government.

6.  Wherefore, I respectfully request that this Court quash, stay or vacate the government's writ summoning Mr. Hammond's testimony and the compulsion immunity order described above; and that the Court direct the government to provide Mr. Hammond with: (1) a copy of the government's writ, (2) any affirmations or other documents supporting the writ and immunity compulsion order, and (3) further detail regarding the scope of the government's intended questioning, as well as such other and further relief as may be just and proper.

Dated:      Brooklyn, New York
            September 10, 2019

                              Respectfully Submitted,

                              By:

                              _____
                                   Susan G. Kellman